UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| LINDA WOLFANGER, Individually and as Administratrix of the Estate of LEE WOLFANGER, | ) ) ) ) | Civil Action No. 6: 06-358-DCR |
| Plaintiff, | ) ) | |
| V. | ) ) | **MEMORANDUM OPINION** |
| LAUREL COUNTY, KENTUCKY, et .al, | ) ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Linda Wolfanger filed this action, individually, and as Administratrix of the

Estate of Lee Wolfanger, against: Laurel County; the Laurel County Fiscal Court; the Laurel

County Sheriff's Department; Gene Hollon, Sheriff of Laurel County, in his official capacity[1];

and Greg Poynter, Deputy Sheriff, in his individual and official capacities.  The Plaintiff's

Complaint alleges violations of 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act

("ADA"), and various state law claims.  This action stems from the unfortunate shooting of Lee

Wolfanger by Deputy Poynter.  The matter is currently pending for consideration of the

Defendants' motion for summary judgment to dismiss the federal and state claims asserted

against them. [Record No. 55]

---

[1]     Recently, the Plaintiff moved the Court to amend the pleadings to substitute the current Laurel County Sheriff in his official capacity.  Because the Court believes that summary judgment is appropriate, this motion to amend will be denied as moot.

-1-

Because the Court finds that Deputy Poynter is entitled to qualified immunity and that the County was not deliberately indifferent in its failure to train on the mentally ill/suicidal, the Defendants are entitled to summary judgment on the 42 U.S.C. § 1983 claims. In addition, because the Court finds that Mr. Wolfanger's behavior – not the County's failure to train – resulted in the shooting, the Defendants are also entitled to summary judgment on the ADA claim. Having determined that the Defendants are entitled to summary judgment on the Plaintiff's federal claims, those claims will be dismiss with prejudice. The Plaintiff's remaining state law claims will be dismissed without prejudice.

## I.      RELEVANT FACTS

On August 15, 2005, Linda Wolfanger called 911 to report that her husband, Lee Wolfanger, was outside their home, armed with a .44 caliber handgun. Mrs. Wolfanger indicated that she and Mr. Wolfanger had an argument and that he had "got angry." Mrs. Wolfanger was "afraid that he . . . [would] hurt himself or somebody else." [Record No. 55, Ex. 15] She also stated that Mr. Wolfanger was depressed and possibly suicidal.

Dispatcher Melody Vess relayed the call to the Laurel County deputies on duty that evening. In addition to stating Wolfanger's address, she reported an incident involving a potentially suicidal subject armed with a .44 caliber handgun. Dispatcher Vess also indicated that the subject was on "quite a few pain pills" and that his family was "not for sure exactly what he might do." [Record No. 55, Ex. 15] Deputies Mike Hamblin, Ryan Young and Greg Poynter responded to the dispatch and advised that they would proceed to the Wolfanger residence. Deputy Poynter was the first to arrive on the scene. Poynter testified that, upon arrival, he saw

a woman, who he later learned was Mindy Wolfanger, standing on the right of the roadway, near the driveway.  [Record No. 55, Ex. F, p. 13]  Because Poynter was not familiar with the area, he asked her if he was in the right location. [Record No. 55, Ex. F, p. 13]  She responded affirmatively and indicated that her father had a gun and was near the bus turnaround. [Record No. 55, Ex. F, p. 13]

Poynter testified that he instructed Mindy Wolfanger to go back to her house and that he turned his spot light on Mr. Wolfanger.  [Record No. 55, Ex. F, p. 15]  At that point, Deputy Poynter stated that he observed a handgun in Mr. Wolfanger's right hand.  [Record No. 55, Ex. F, p. 17, 22]  Poynter testified that he then exited his vehicle and told Mr. Wolfanger drop his gun.  [Record No. 55, Ex. F, p. 25]  He stated that Mr. Wolfanger responded "get off [the] land, or something to the effect."  [Record No. 55, Ex. F, p. 26]  Mindy Wolfanger verified this portion of Deputy Poynter's testimony, stating that she made it a quarter or a third of the way down the driveway when she heard Deputy Poynter say "drop your weapon."  [Record No. 55, Ex. D, p. 35]  She stated, however, that she was unable to decipher her father's "muffle[d]" response.  [Record No. 55, Ex. D, p. 35]  Poynter further testified that he told Mr. Wolfanger more than one time to drop his gun, but that Wolfanger did not comply with the demand. [Record No. 55, Ex. F, p. 25]  Poynter testified that, instead, Wolfanger pointed the gun toward him.  [Record No. 55, Ex. F, p. 28]  At that point, Deputy Poynter stated that he fired one shot, striking Wolfanger in his lower right side.

Deputy Poynter remained in a cover position and radioed dispatch stating, "[S]hots fired. Hit the suspect.  He's down.  Need EMS and a supervisor."  [Record No. 55, Ex. 4] He further

reported to dispatch that Mr. Wolfanger was "holding a .44 mag in the side of his hand. I tried to get him to put it down; he raised it. This is bad. I need some units out here." [Record No. 55, Ex. 4]

Within minutes of the shooting, Deputies Hamblin and Young arrived at the scene. Deputy Hamblin testified that, upon arrival, he observed

> Mr. Wolfanger lying up in a gravel area to the left hand side of the road. I was not for sure where the weapon as at. I saw it lying just beyond Mr. Wolfanger's feet, and I secured the – I physically picked the weapon up, and secured it. That way there would be no danger of any other shots being fired.

[Record No. 55, Ex. G, p. 11] Deputy Hamblin stated that he recalled that Mr. Wolfanger's gun was close to his body and near his feet. [Record No. 55, Ex. G, p. 15] He also testified that he noticed a walking cane. [Record No. 55, Ex. G, p. 15] Deputy Young testified that he remembers seeing the gun on the ground near the left side of Mr. Wolfanger's body. [Record No. 55, Ex. H, p. 9] He also observed a cane on the ground. [Record No. 55, Ex. H, p. 9]

Mr. Wolfanger died four days later, on August 19, 2005, as a result of the gunshot wound.

On August 14, 2006, Linda Wolfanger, individually and on behalf of the Estate of Lee Wolfanger, filed suit against the Defendants for the alleged use of excessive force and for an alleged failure to train and supervise the officers, in violation of the Fourth and Fourteenth Amendments. In addition, she alleges that the Defendants violated Title II of the ADA by failing to accommodate Mr. Wolfanger's alleged mental disability. Finally, she has asserted various state law claims, including negligence, wrongful death and loss of consortium. The Defendants have now moved for summary judgment on all the claims asserted against them.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

"Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The nonmoving party cannot rely upon the assertions in its pleadings; rather that party must come forward with probative evidence, such as sworn affidavits to support its claims. *Celotex*, 477 U.S. at 324. In making this determination, the Court must review all the facts and the inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. Ultimately, the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) quoting *Anderson*, 477 U.S. at 251-52.

### III.    ANALYSIS

#### A.    § 1983 Claims

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989) (citing *West v. Atkins*, 487 U.S. 42 (1988)). Here, the Plaintiff claims that her deceased husband's Fourth Amendment rights were violated by the Defendants. The Fourth Amendment protects persons from the use of excessive force by law enforcement officers in the course of an arrest, investigatory detention or any other "seizure." *Graham v. Connor*, 490 U.S. 386, 388 (1989).

The Plaintiff has asserted a claim under 42 U.S.C. § 1983 against Deputy Poynter, in his individual capacity, for excessive force in violation of the Fourth Amendment of the United States Constitution. Deputy Poynter claims that he is entitled to qualified immunity under federal law with respect to this claim. The Plaintiff has asserted a claim under 42 U.S.C. § 1983 against Laurel County, Laurel County Fiscal Court, Laurel County Sheriff's Department, Gene Hollon and Greg Poynter, in their Official Capacities[2] ("County Defendants") for failure to

---

[2]    A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity. *Matthew v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 68 (1989)). The Government entity in this case is Laurel County.

adequately train and supervise Deputy Poynter.  The Defendants argue that they are entitled to judgment in their favor because the Plaintiff has failed to establish deliberate indifference.

### 1.       Excessive Force Claim

Deputy Poynter has moved for summary judgment with respect to the Plaintiff's § 1983 claim of excessive force, claiming that he is entitled to qualified immunity. When asserting a § 1983 claim, a plaintiff must overcome the defense of qualified immunity which provides that "government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The burden is on the plaintiff to show that the defendant is not entitled to qualified immunity.  *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006).  In the context of excessive force, "it is not enough that a plaintiff establishes that the defendant's use of force was excessive under the Fourth Amendment.  To defeat qualified immunity, the plaintiff must show that the defendant had notice that the manner in which the force was used had been previously proscribed." *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007).  The Supreme Court has developed a two-part test to determine whether a defendant is entitled to qualified immunity under the circumstances of a case.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, a court must determine if the facts taken in the light most favorable to the injured party show that the officer's conduct violated a constitutional right.  *Id*.  Then, if the court finds that such a violation has occurred, it must determine if the right was "clearly established." *Id*.

In *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), the Supreme Court held that "the Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect." *Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). The use of deadly force is only reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11; *see also Sample*, 409 F.3d at 699 (quoting *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)) ("[A] criminal suspect 'has a right not to be shot unless he is perceived to pose a threat to the pursuing officers or to others during flight.'").

The Sixth Circuit has repeatedly noted that, "only in rare instances may an officer seize a suspect by use of deadly force." *Livermore*, 476 F.3d at 404. There are three factors to consider in determining whether an officer's actions were reasonable under the Fourth Amendment: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Smoak*, 460 F.3d at 783 (6th Cir. 2006)). However, "[t]hese factors are not an exhaustive list, as the ultimate inquiry is 'whether the totality of circumstances justifies a particular sort of seizure.'" *Id.* (quoting *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)).

Here, the Court must determine whether Deputy Poynter's use of deadly force was reasonable. Typically, the Court reviews the facts in the light most favorable to the plaintiff. However, because Mr. Wolfanger is deceased, he cannot offer his version of the events in question. As such, no direct evidence exists to rebut Deputy Poynter's version of the facts. The

Sixth Circuit has recognized that "where an officer defendant is the only witness left alive to testify, the award of summary judgment to the defense in a deadly fore case must be decided with particular care." *Burnette v. Gee*, 137 Fed. Appx. 806, 809 (6th Cir. 2005) (citing *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)).   In such circmustances, the Court must "undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial." *Plakas*, 19 F.3d at 1147.

In *Burnette v. Gee*, *supra*, the Sixth Circuit addressed a factually similar situation in which the officer and the deceased were the only witnesses to the events.   In that case, the deceased attempted to commit suicide by overdosing on prescription medication.   A paramedic arrived at his home to render assistance, but Wilson refused the help and threatened the paramedic with a gun.   The paramedic left the home and called law enforcement.   When the sheriff arrived, he was told that Wilson had "gone crazy" and that he had a gun.   The sheriff entered the home in an attempt to disarm Wilson.   The sheriff testified that he repeatedly asked Wilson to put the gun down but Wilson refused.   The sheriff further testified that, when Wilson leaned over to put on his left shoe, he decided to try to disarm Wilson by drawing his gun and charging toward him.   As the sheriff approached him, Wilson grabbed his rifle and raised it toward the sheriff.   The two men wrestled over the rifle and the sheriff ended up shooting Wilson four times.   Wilson died as a result of the gunshot wounds.

On appeal, the plaintiff argued that district court erred in granting summary judgment to the sheriff on the grounds of qualified immunity because "issues of material fact exist[ed] as to

whether Wilson even reached for his rifle in response to Sheriff Gee's charge." *Burnette*, 137 Fed. Appx. at 810. Specifically, the plaintiff asserted that, if a jury could find that Wilson did not reach for his gun, it could also find that the sheriff's conduct was unreasonable. However, the court found that no direct evidence or circumstantial evidence existed to rebut Sheriff Gee's version of the events.

The court specifically addressed three pieces of evidence that were presented to contradict the sheriff's testimony. First, the court held that testimony from Wilson's mother, who had been in the room and seen the rifle "upright on the outside of the right arm of the chair," did not conflict with the sheriff's testimony, since Wilson had an opportunity to move the rifle after Wilson's mother had seen it. *Id*. at 811. Second, the court discussed a report by a doctor concluding that "the effects of the drugs consumed by Wilson prior to the shooting would result in 'sedation rather than agitation and aggressive behavior.'" *Id*. The court determined that the doctor's conclusion did not actually conflict with the sheriff's statement that Wilson reached for and grabbed his rifle. In particular, the court noted that the paramedics and his family acknowledged that Wilson was not asleep or unconscious at the time of the incident and, although Wilson could have been more sedated than usual, he still could have managed to grab the rifle. *Id*. Finally, the court discussed a report by a forensic consultant concluding that Wilson had been shot from a distance of ten to twenty inches, and that it was therefore impossible for Wilson to have been pointing his forty-inch rifle at the sheriff at the time the sheriff shot him. The court concluded that this evidence did not conflict either, since the sheriff claimed only to have shot Wilson while struggling over the rifle, but not while the rifle was

pointed at him.  *Id*.  After considering this evidence, the court concluded that none of the evidence actually conflicted with the sheriff's version of events.  Therefore, the court upheld the district court's grant of summary judgment to the defendants on the constitutional issues.

In the present case, the Plaintiff argues that a genuine issue of material fact exists regarding whether Deputy Poynter's use of deadly force was reasonable.  The Plaintiff relies, in part, on a recent decision from the Sixth Circuit, *Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007).  In *Bouggess*, the Sixth Circuit affirmed the denial of qualified immunity to an officer who fatally shot a fleeing suspect.  There, the officer attempted to arrest the suspect on suspicion of dealing crack cocaine.  After a struggle, the suspect ran and the officer drew his gun and fired three shots into the suspect's back.  The officer testified that, during the struggle, the suspect had a look in his eye "like, man I'm going to kill you," so he drew his weapon.  *Id*. at 888, fn.2.  He stated that the suspect tried to take the gun from him and that one shot was fired during the altercation.  The officer's version of the events was substantially disputed by four eyewitnesses who testified that, during the struggle, no guns were drawn and no shots were fired.   In particular, the eyewitnesses stated that the suspect did nothing but run away before the officer opened fire.  Viewing the facts in the light most favorable to the estate of the suspect, the Court found that the officer did not have probable cause to believe the suspect posed a serious threat to him.

Here, Deputy Poynter and Mr. Wolfanger were the only two people to witness the events immediately preceding the shooting.  And, unlike in *Bouggess*, there are no eyewitnesses to dispute Deputy Poynter's account of the events that occurred just prior to the shooting.

However, as previously noted, in instances such as this where the shooting officer is the only eye-witness able to testify to the events in question, the Court is required to "undertake a fairly critical assessment of the . . . evidence." *Burnette*, 137 Fed. Appx. at 809.

Deputy Poynter testified that, as a result of the 911 dispatch, he was aware that he was investigating a situation involving an armed, suicidal individual whose family was fearful of what he might do. Deputy Poynter further testified that, when he arrived at the scene, he encountered Mindy Wolfanger who pointed him in the direction of her father and told him that Mr. Wolfanger had a gun. Deputy Poynter immediately spotlighted Mr. Wolfanger and observed a gun in Mr. Wolfanger's his right hand. He testified that prior to firing his weapon, he repeatedly ordered Mr. Wolfanger to drop his gun. This portion of Deputy Poynter's testimony is corroborated by Mindy Wolfanger who testified that, as she was walking down the roadway, she heard Deputy Poynter tell her father to drop his gun. Deputy Poynter testified that Mr. Wolfanger refused to follow his directives. Instead, he stated that Mr. Wolfanger raised the gun toward him and, at that point, he feared for his safety and he fired his weapon.

In support of her position that Deputy Poynter is not entitled to qualified immunity, the Plaintiff relies on evidence which she claims contradicts the officer's testimony. Specifically, she points to evidence which she contends creates a question of material fact as to whether, at the time of the shooting, Deputy Poynter actually observed a gun in Mr. Wolfanger's *right* hand. The Plaintiff notes that photos taken after the shooting indicate that Mr. Wolfanger most likely had a cane, not a gun, in his right hand. The Plaintiff points out that both Mindy Wolfanger and Deputy Young testified that, after the shooting, they saw a cane laying on Mr. Wolfanger's right

-12-

side.  Moreover, the Plaintiff notes that Deputy Young testified that when he arrived at the scene, he saw the gun lying on Mr. Wolfanger's *left* side.  The Plaintiff argues that this evidence directly contradicts Deputy Poynter's testimony that Mr. Wolfanger had a gun in his right hand. The Plaintiff also refers to the  findings of Dr. Gregory Davis, the medical examiner who signed the Coroner's report.  According to the Plaintiff, Dr. Davis will testify that the bullet struck Mr. Wolfanger at an angle of approximately 60 degrees right of center.  The Plaintiff contends that Dr. Davis' testimony establishes that, at the time of the shooting, Mr. Wolfanger was standing at an angle in which Deputy Poynter could not have seen what, if anything, Wolfanger was holding in his left hand.  The Plaintiff argues that because the evidence shows that Mr. Wolfanger had a cane in his right hand and because Deputy Poynter would not have been able to see what was in Mr. Wolfanger's left hand, there is a genuine issue of material fact regarding whether Deputy Poynter observed a gun in Mr. Wolfanger's hand and whether the use of deadly force was reasonable.

The Plaintiff's evidence, however, simply does not sufficiently support the conclusions she seeks to draw.  The photos and Deputy Young's testimony regarding the location of the gun *after* the shooting do not establish the location of the gun *at the time of* the shooting and thus the Plaintiff's evidence does not contradict Deputy Poynter's testimony as to the location of Wolfanger's gun just prior to or at the time that Deputy Poynter fired his weapon.  Moreover, Dr. Davis' opinions regarding the angle in which the bullet entered Mr. Wolfanger's abdomen does not contradict Deputy Poynter's testimony that he observed a gun, not a cane, in Mr. Wolfanger's right hand.  In the absence of eyewitness testimony or forensic evidence regarding

how the gun may have fallen after impact, the Plaintiff's theory that Wolfanger either did not have a gun or was holding the gun in his left hand is the product of speculation – not of reasonably drawn inferences.  As previously noted, the Plaintiff has failed to present any direct or circumstantial evidence that contradicts Deputy Poynter's version of the facts.  Instead, the evidence of record establishes that Wolfanger was in possession of a gun at the time of the shooting and that Deputy Poynter was aware that Wolfanger was distraught.  Deputies Hamblin and Young were the first two people to arrive at the Wolfanger residence after the shooting and both indicated that they observed a gun.  Further, Mr. Wolfanger's wife and daughter both testified that Mr. Wolfanger left the house with a gun and was in possession of it outside.  The Plaintiff has failed to present any evidence to contradict Deputy Poynter's statement that Mr. Wolfanger disobeyed his requests to drop his gun.  In fact, the testimony of Mindy Wolfanger corroborates this fact.

Finally, because the Plaintiff has failed to present any evidence to rebut Deputy Poynter's testimony that Mr. Wolfanger raised the gun toward him, the Court cannot conclude that a reasonable jury could find that Deputy Poynter used excessive force against Mr. Wolfanger. Under the undisputed facts presented here, when Wolfanger threatened Deputy Poynter with a gun, Deputy Poynter could have reasonably feared for his own life and therefore the use of deadly force was reasonable.  *See Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989 (*citing Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1353 (5th Cir. 1985) ("The use of deadly force is reasonable is an officer believes that there is a threat of serious physical harm to the officer or others."))

-14-

## 2.   Failure to Train Claims

Laurel County, the Laurel County Fiscal Court, the Laurel County Sheriff's Department, Sheriff Gene Hollon and Deputy Greg Poynter, in their official capacities ("County Defendants") have moved for summary judgment on the Plaintiff's § 1983 failure to train claims.  The Plaintiff alleges the County is liable under § 1983 because it (1) "failed to adequately train and supervise its law enforcement personnel" on the "constitutional limitations of deadly force;" and (2) failed to adequately train its deputies regarding "the proper procedure in handling a situation with a perceived mentally ill or suicidal individual."  [Record No. 38, Amended Complaint, ¶¶ 15, 21]

In *Monell v. Department of Social Svcs.*, 436 U.S. 658 (1978), the Supreme Court established that municipalities and other local governments are persons within the meaning of § 1983, and therefore may face liability under § 1983.  *Monell*, however, limits municipal liability to situations where the deprivation of constitutional rights results from an official policy or custom of the municipality.  *Id.* at 690.  In addition, *Monell* prevents a municipality from being held liable under a respondeat superior theory.  *Id.* at 691.

In *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), the Supreme Court articulated the standard for failure to train claims.  The inadequacy of police training may serve as the basis for § 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id.* at 387.  The Court further explained that a municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation.  Thus, only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its

-15-

inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.

There are two situations in which a court can find deliberate indifference in the failure to train police officers. The first occurs when a city fails to react to repeated complaints of constitutional violations by its officers. *Id*. at 390, n. 11. The second situation occurs when a city fails to provide adequate training in light of foreseeable serious consequences that could result from lack of instruction. In *Harris*, the Court cited lack of instruction on the use of firearms or in the use of deadly force as examples of what could constitute deliberate indifference. *Id*. at 390. Thus, when the need to train is "so obvious" that the failure to do so could properly be characterized as "deliberate indifference" to constitutional rights, liability against a municipality under § 1983 is proper. *See Tennessee v. Garner*, 471 U.S. 1 (1985).

In *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992), the Sixth Circuit applied the *Harris* test and further defined what a plaintiff had to prove in order to demonstrate that a training program is the moving force behind a constitutional violation. The court held that, to prove a failure to train claim, a plaintiff must establish: (1) that the training program was inadequate for the tasks that officers must perform; (2) that the inadequacy was the result of the city's deliberate indifference; and (3) that the inadequacy was "closely related to" or "actually caused the . . . injury." *Id*. at 1046 (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1346 (6th Cir. 1994) (same).

As previously noted, inadequate training may amount to a municipal policy only if "the need for more or different training is so *obvious*, and the inadequacy so likely to result in the

-16-

violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been *deliberately indifferent* to the need." *Russo*, 953 F.2d at 1049 (citing *Harris*, 489 U.S. at 390) (emphasis added). Here, in order to hold the County liable, the trier of fact would have to find that the inadequacy of training was so likely to result in the constitutional injury to mentally ill persons that the County's policymakers could be deemed to be callous and indifferent to the need for training in that area. The Plaintiff has the burden of proving the municipality's alleged policy of deliberate indifference and that the deficiency, if any, was a proximate cause of the death.

Regarding the allegation that the County failed to adequately train and supervise its deputies with respect to the proper use of deadly force, the Laurel County firearms policy provides as follows:

E.   Deadly force may only be used when the officer has made a reasonable judgment that there exists an imminent threat to his life or to that of another human being by the following examples:

1.   This includes the apprehension of a person who, in the course of criminal activity, threatened or used deadly force.

2.   On misdemeanors, deadly force may be used only in the case of imminent threat of life.

3.   Deadly force may never be used on mere suspicion of an offense. An officer must witness the offense or have sufficient evidence to know, as a certainty, of the offense and the identity of the perpetrator.

4.   Deputies are reminded of the principal of "lesser force" in any apprehension, and should use deadly force as a last resort.

5.   Warning shots are considered deadly force and should not be used under any circumstances.

-17-

[Record No. 55, Ex. 9]   There is no evidence in the record regarding the type or extent of training on deadly force actually received by Laurel County deputies.  However, the Plaintiff has failed to produce any evidence that would indicate that the County's training of its police officers with regard to excessive force was inadequate.

Next, with respect to the allegation the County failed to adequately train its deputies concerning handling mentally ill and/or suicidal persons, the Plaintiff notes that Sheriff Gene Hollon testified that Laurel County did not provide its deputies with *any* training on the handling of the mentally ill.  In support of the claim that this failure constitutes deliberate indifference, the Plaintiff relies on the testimony Dr. Geoffrey Alpert.   Dr. Alpert's preliminary report regarding the use of deadly force provides that:

> Deputy Poynter had not been trained to deal with mentally ill and/or suicidal suspects as verified by the deposition testimony of Sheriff Gene Hollon, and Deputy Poynter.   Such conduct may equate to "deliberate indifference" as recognized by the United States Supreme Court in City of Canton v. Harris.  This is especially troubling as law enforcement training to deal with specific population is available and well-established.   In fact, the failure to provide deputies with rudimentary training to handle recurring situations such as managing persons with mental disabilities amounts to deliberate indifference to those with challenges.

[Record No. 61, Ex. 1]

As a general matter, the Court notes that Dr. Alpert's opinions regarding the deficiencies in Deputy Poynter's training are insufficient to hold the county liable under a failure to train claim.  Notably, in *City of Canton*, the Supreme Court specifically stated that, the fact "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the

-18-

city" because "the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91.

To support their contention that the County adequately trained its deputies, the Defendants note that the County requires its deputies to comply with all the requirements of the Commonwealth of Kentucky. In particular, the deputies are required to have formal training at a nationally recognized law enforcement training center and forty hours of yearly in service. While Dr. Alpert suggests that the County was "deliberately indifferent" in its failure to provide its deputies with specialized training in handling mentally ill and/or suicidal individuals, the mere fact that Laurel County did not offer any specialized training in this area does not necessitate a finding that the County acted unconstitutionally.

As noted above, a plaintiff's allegations of inadequate training will not trigger § 1983 liability, unless the situation causing the injury is recurring such that the Court may impute prior knowledge and deliberate indifference to the municipality. Here, the Plaintiff has not suggested that this set of circumstances has ever arisen before, let alone occurred with frequency so as to impute liability to the County. Likewise, the Plaintiff has not shown that Deputy Poynter had a history of using excessive force against mentally ill individuals.

Finally, the Plaintiff has failed to produce any specific evidence demonstrating that the shooting was proximately caused by the alleged failure to train. *See Estate of Sowards v. City of Trenton*, 125 Fed. Appx. 31, 41 (6th Cir. 2005) (decedent's death due to his own threatening actions, not the alleged failure to train the police officers to deal with mentally ill persons). In other words, the Plaintiff has not presented evidence establishing that Lee Wolfanger would not

have been shot if Deputy Poynter had received training on how to handle mentally ill and/or suicidal persons.

In *Estate of Sowards*, the Sixth Circuit addressed the proximate cause element of a § 1983 failure to train claim. There, the court found that the decedent's death was due to his own threatening actions, not the alleged failure to train the police officers to deal with mentally ill persons. Similarly, in the present case, the brief time period of the incident and Wolfanger's threatening behavior prevented Deputy Poynter from reflecting on the reason for Mr. Wolfanger's behavior and provided him with little opportunity to consider alternate action based on Mr. Wolfanger's mental state. Therefore, the Court finds that the Plaintiff has failed to create a genuine issue of material fact regarding the element of causation.

In summary, because the Plaintiff has failed to raise a question of material fact as to whether the County's failure to train its deputies on the handling of mentally ill/suicidal individuals constitutes deliberate indifference by the County leading to inadequacy in training that was closely related to the injuries suffered by Plaintiff, the Court finds that the County is entitled to summary judgment on the failure to train claims.

### B.    ADA Claim

As previously noted, the Plaintiff has also alleged a claim against the Defendants under the ADA. According to the Plaintiff, the Defendants discriminated against Mr. Wolfanger "by failing to make reasonable modifications to their policies, practices and procedures to ensure his needs as an individual with a disability or a perceived disability would be met." [Record No. 38, Amended Complaint, ¶ 26]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The statute defines a "public entity" as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12132(1)(B).

To establish a violation under the ADA, the Plaintiff must demonstrate that: (1) Mr. Wolfanger was a "qualified individual" with a disability; (2) he was subject to the ADA; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant, by reason of his disability. The Plaintiff has not identified the "benefits . . . ,programs, or activities," that Mr. Wolfanger was denied, but argues that, if the County had properly trained its officers in how to approach mentally ill and/or suicidal individuals, the situation would not have escalated to the point of needing to use deadly force. 42 U.S.C. § 12132. However, as previously discussed, the Court finds that it was not the County's failure to train its officers, but Mr. Wolfanger's defiant, threatening behavior that precipitated the shooting. *See Ali v. City of Louisville*, 395 F. Supp. 2d 527 (W.D. Ky. 2005) (noting that if the decedent was denied medical treatment, it was because of his violent, threatening behavior, not because he was mentally disabled); *see also Bates v. Chesterfield County*, 216 F.3d 367, 373 (4th Cir. 2000) (rejecting an ADA claim because "the stop, the use of force, and the arrest of Bates [an autistic teenager] were not by reason of Bates' disability, but because of Bates' objectively verifiable misconduct. Such

reasonable police behavior is not discrimination.").  These holdings and common sense dictate a finding that Laurel County, the only public entity at issue, did not violate Mr. Wolfanger's rights under the ADA.

### C.    State Law Claims

Having determined that the Defendants are entitled to summary judgment on the federal claims, the Court must decide whether to continue to exercise supplemental jurisdiction over the state law claims.  In *Valot v. Southeast Local School Dist. Bd. of Educ.*, 107 F.3d 1220 (6th Cir. 1997), the Sixth Circuit stated that a district court may decline to exercise supplemental jurisdiction over state law claims where it has dismissed all of the federal claims over which it had original jurisdiction. *See also Weeks v. Portage County Executive Offices*, 235 F.3d 275 (6th Cir. 2000).  Supplemental jurisdiction is governed by 28 U.S.C. § 1367, which includes an explicit provision permitting district courts to decline to exercise supplemental jurisdiction when the court has dismissed all of the claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3).

Here, having granted summary judgment to the Defendants and dismissed all of the federal claims in this action, the Court will decline to continue to exercise supplemental jurisdiction over the state law claims.  *See Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) (noting that declining to continue to exercise supplemental jurisdiction over state law claims is "the usual course," when all federal claims have been disposed of on summary judgment); *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997) (recognizing that if all federal claims are dismissed before trial, remaining state law claims

generally should be dismissed as well).  Accordingly, the Court will dismiss the Plaintiff's state law claims, without prejudice.

### III.   CONCLUSION

For the reasons discussed herein, it is hereby **ORDERED** that

1.      The Defendants' motion for summary judgment [Record No. 55] is **GRANTED** with respect to the Plaintiff's claims under 42 U.S.C. § 1983 and the Americans with Disabilities Act.  Those claims are **DISMISSED** with prejudice.

2.      Because the Court declines to exercise jurisdiction over the Plaintiff's state law claims, these claims are **DISMISSED** without prejudice.

3.      The Plaintiff's motion to substitute a party [Record No. 93] is **DENIED** as moot. This 17th day of January, 2008.

Signed By:

_Danny C. Reeves_   DCR

**United States District Judge**